**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CHESTER FUSCO, | ) | CASE NO. 1:15CV2487 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Chester Fusco ("Plaintiff" or "Fusco"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) & 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further proceedings consistent with this Opinion.

## I.   PROCEDURAL HISTORY

In March 2012, Fusco filed applications for POD and DIB alleging a disability onset date

of March 3, 2008 and claiming he was disabled due to "severe anxiety and depression, back

problems, knees buckle– right requires total knee replacement, cannot use left shoulder, chronic pain in knees and left shoulder and lower back, heart problems, diabetes."  (Transcript ("Tr.") 73 -74.)  The applications were denied initially and upon reconsideration, and Fusco requested a hearing before an administrative law judge ("ALJ").  (Tr. 106- 108, 114-120, 121.)

The ALJ held hearings on February 26, 2014 and May 19, 2014.  (Tr.  29-49, 51-71.) Fusco, represented by counsel, and impartial VEs testified at both hearings.  (*Id.*)  On August 1, 2014, the ALJ issued a written decision finding Fusco was not disabled.  (Tr. 11-23.)  The ALJ' s decision became final on October 27, 2015, when the Appeals Council declined further review. (Tr. 1-3.)

On December 3, 2015, Fusco filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.) Fusco asserts the following assignments of error:

> (1)  The ALJ erred in finding that the Plaintiff's depression and anxiety were not severe.

> (2)  The ALJ did not properly weigh the opinion evidence when determining the Plaintiff's residual functional capacity.

(Doc. No. 15.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Fusco was born in October 1956 and was fifty-seven (57) years-old at the time of his administrative hearing, making him a "person of advanced age" under social security regulations.  (Tr. 73.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  He completed the tenth grade and is able to communicate in English.  (Tr. 42.)  He has past relevant work as a gas

station attendant.  (Tr. 22.)

**B.      Relevant Medical Evidence[1]**

**1.        Physical Impairments**

On June 5, 1998, Fusco sustained injuries to his right leg and hip, lumbar region, left elbow and right knee when he fell from a window while working as a sign installer.  (Tr. 563, 861.)  Fusco was transported to an emergency room ("ER") where his right knee was placed in an immobilizer and he was treated with pain medication.  (Tr. 563, 862.)  He began treatment with Jeffrey Brodsky, D.O., on June 9, 1998.  (Tr.  563.)  Dr. Brodsky ordered x-rays, which showed "[n]o acute pathology including hip, lumbar spine, left elbow, and right knee."  (*Id*.)  He diagnosed the following conditions: "Grade II sprain medial collateral ligament, right knee. Internal derangement right knee, possible tear medial meniscus.  Rule-out fracture right hip. Lumbar strain/sprain, and sprain left elbow."  (*Id*.)  Fusco began physical therapy in July 1998. (*Id*.)

In October 1998, Fusco presented to Dr. Brodsky with continuing complaints of knee pain as well as "catching [and] giving way."  (Tr. 564.)  Dr. Brodsky ordered arthroscopic surgery on Fusco's right knee, which was performed on December 9, 1998.  (Tr. 564-565.) Fusco began physical therapy and was found to be doing "much better" and "extremely well" during visits to Dr. Brodsky in January and February 1999.  (Tr. 566.)  He was discharged from

---

[1] As Fusco is challenging the denial of his applications for POD and DIB only, the Court will generally confine its discussion of the medical evidence to that which is relevant to the time period between his March 2008 onset date and his December 2010 date last insured.  In addition, as the parties focus their arguments principally on Fusco's right knee impairment, left shoulder impairment, and mental impairments, the Court will limit its discussion of the evidence to those conditions.

physical therapy in late March 1999 and cleared to return to work the following month.  (*Id.*)

Several years later, in October 2003, Fusco returned to Dr. Brodsky after injuring his right knee and hip while "going up and down a ladder at work."  (Tr. 567.)  An x-ray showed "no acute pathology" and Dr. Brodsky diagnosed a right knee medial meniscus tear.  (*Id.*)  Fusco began physical therapy but reported continuing knee pain in November 2003.  (*Id.*)  Dr. Brodsky believed Fusco's pain was an "aggravation of his previous injury" in 1998 and recommended he undergo arthroscopic surgery on his right knee.  (*Id.*)  Fusco underwent surgery on February 5, 2004.  (Tr. 568-569.)

After Fusco reported continuing pain and weakness, Dr. Brodsky administered steroid injections in March 2004.  (Tr. 568.)  Fusco reported doing "much better" in April and May 2004.  (Tr. 570.)  In August 2004, however, Fusco again complained of knee pain and tenderness.  (*Id.*)  Dr. Brodsky assessed a medial meniscus tear of Fusco's right knee and recommended another arthroscopic surgery.  (*Id.*)  Fusco underwent surgery in September 2004.  (Tr. 571-572.)  He reported continuing "pain and problems" the following month.  (Tr. 571.)

Fusco returned to Dr. Brodsky in March 2005, with complaints of ongoing right knee pain, as well as left knee pain.  (Tr. 573.)  In July 2005, Dr. Brodsky noted Fusco's "knee clicks and snaps, and also the meniscal repair device is bothering him. This needs to be removed." (*Id.*)  Fusco thereafter underwent surgery in August 2005 to remove "painful hardware" from his right knee.  (Tr. 573-574.)

In December 2005, Fusco reported "difficulty with walking, sitting, and other related activities" due to knee pain.  (Tr. 575.)  He stated physical therapy "did not improve his knee." (*Id.*)  Dr. Brodsky recommended another arthroscopic surgery, requesting approval for the

procedure in December 2005 and again in February 2006.  (*Id*.)  The record reflects Fusco

underwent his fourth arthroscopic surgery in March 2006.  (Tr. 576.)  He reported improvement

and "minimal pain" in May 2006, but joint pain and "difficulty with squatting and kneeling" in

June 2006.  (Tr. 576, 578.)  In July and August 2006, Fusco complained of pain and tenderness

in both legs and reported difficulty sleeping, inability to progress in physical therapy, and

"difficulty pushing, braking on his car because of his knee, and doing related activities."  (Tr.

578.)  Dr. Brodsky administered injections on Fusco's right knee in November and December

2006.  (Tr. 579.)

In January 2007, Fusco presented to Dr. Brodsky for evaluation of his left elbow after

slipping and falling.  (Tr. 580.)  X-rays showed "no significant pathology."  (*Id*.)  Dr. Brodsky

assessed left shoulder sprain and advised Fusco to begin therapy for his shoulder and arm, as

well as continue therapy for his knee.  (*Id*.)  Fusco complained of achiness, clicking, and popping

in his right knee in February 2007 and continuing pain and problems in March 2007.  (*Id*.)  Dr.

Brodsky stated that "[b]ecause the patient has failed all treatment options, I feel it is appropriate

to take him to surgery for medial uni-knee arthroplasty."  (*Id*.)

In May 2007, Fusco underwent x-rays of his right knee, which showed a "minimal

amount of joint space narrowing on the medial compartment."  (Tr. 581.)  Fusco continued to

complain of pain in June and July 2007, stating he has "pain all over his body– his knees, his

shoulders."  (*Id*.)  Dr. Brodsky noted that Fusco was "waiting for workman's comp to approve

something to be done."  (*Id*.)          In September 2007, Fusco complained of right hip pain, but

x-rays showed "no obvious pathology" in either his hip or lumbar spine.  (*Id*.)  Dr. Brodsky

assessed right greater trochanteric bursitis.  (*Id*.)

5

In November 2007, Fusco underwent MRIs of his right knee and left shoulder.  (Tr. 558, 559.)  The right knee MRI revealed the following: (1) small to moderate joint effusion; (2) mild degenerative changes about the medial aspect of the knee joint; and (3) "somewhat small or blunted appearance to the medial meniscus in its mid pole area, suggesting that a portion of the apex of the meniscus is no longer present."  (Tr. 558.)  The left shoulder MRI showed: (1) very minimal area of signal change in the region of the rotator cuff tendon insertion, consistent with partial tear; (2) degenerative changes consistent with edema; and (3) type III acromion.  (Tr. 559.)  After reviewing the results, Dr. Brodsky noted that "this patient has failed all conservative treatment.  He will need surgery of his right knee and left shoulder in the future."  (Tr. 582.)  Fusco underwent a cortisone shot in his right knee in February 2008.  (Tr. 583.)

In March 2008, Fusco presented to the ER with complaints of increased right knee pain.  (Tr. 441-447.)  ER treatment records indicate Fusco was ambulating with a cane.  (Tr. 446.)  Fusco was diagnosed with chronic right knee pain, and received an injection of Toradol.  (Tr. 441-447.)  Fusco returned to Dr. Brodsky in April 2008, complaining of "ongoing and significant pain in his right knee."  (Tr. 583.)  Dr. Brodsky ordered an MRI, which showed "no significant pathology."  (*Id*.)

Fusco thereafter began treatment with Robert M. Fumich, M.D., in May 2008.  (Tr. 394.)  Examination revealed prolapse instability to valgus, full motion, no effusion, positive grind, and "some" medial joint tenderness.  (*Id.*)  X-rays "including standing show surprisingly good medial joint space and no patellofemoral arthritis."  (*Id*.)  Dr. Fumich concluded Fusco was "a candidate for arthroscopy of the knee, both for treatment and for evaluation for future treatment with regard to options in knee replacement if the pathology so relates."  (*Id*.)  Dr. Fumich

6

requested authorization for the procedure. (*Id.*)

Dr. Fumich performed arthroscopic surgery on Fusco's right knee in July 2008. (Tr. 395.) Dr. Fumich's notes indicate that "[t]here is nothing in this knee to indicate the necessity of knee replacement." (*Id.*) Fusco returned to Dr. Fumich in August 2008, at which time Dr. Fumich noted full motion and no effusion but some quad atrophy. (Tr. 395.) Fusco underwent an ultrasound for deep vein thrombosis ("DVT") which was negative. (*Id.*)

In August 2008, Fusco began physical therapy sessions with Randall W. Schiff, P.T., A.T.C. (Tr. 1216-1217.) Fusco reported "that he cannot bend his knee all the way, has no strength in the leg, and needs his cane to walk. Patient reports that his knee just continues to progressively fall apart on him." (Tr. 1216.) Examination revealed tenderness to palpation, reduced range of right knee motion, reduced strength, and good stability. (Tr. 1216-1217.) Mr. Schiff noted that Fusco ambulated with a limp using a straight cane, was unable to ascend and descend stairs normally, and was unable to squat or kneel. (Tr. 1217.) During a session several weeks later, Fusco reported improved strength and range of motion and "the ability to walk without a cane at this time." (Tr. 1210-1211.) He was still, however, unable to squat, kneel, or ascend/descend stairs normally. (Tr. 1211.)

In September 2008, Dr. Fumich noted atrophy to Fusco's right knee and advised him to "work on motion and strength." (Tr. 396.) The following month, Dr. Fumich prescribed MOBIC for Fusco's right knee medial symptoms. (*Id.*) In November 2008, Fusco reported no improvement. (*Id.*) Dr. Fumich diagnosed arthritic right knee and administered a cortisone injection. (*Id.*) Fusco returned to Dr. Fumich in December 2008, reporting "only four days relief from pain in the right knee with the cortisone injection." (Tr. 397.) Dr. Fumich requested

7

authorization for Hyalgan injections and a deloader brace.  (*Id.*)

Meanwhile, Fusco returned to Mr. Schiff for physical therapy sessions in September, October, and November 2008.  (Tr. 1174-1175, 1187-1188, 1198-1199.)  In September 2008, Fusco reported his right knee remained "very tender and he has to be very careful how he moves."  (Tr. 1198.)  Examination revealed moderate tenderness to palpation, reduced range of motion, and improved strength.  (*Id.*)  Fusco was able to ambulate independently with a limp, but was unable to squat, kneel, or ascend/descend stairs normally.  (*Id.*)  In October 2008, Fusco reported that "his knee is really not getting any better."  (Tr. 1187.)  Mr. Schiff noted Fusco's "right leg strength has improved a bit, but he continues to have knee pain and quadricep and hamstring work."  (*Id.*)  In November 2008, Fusco reported "his right knee continues to be tender and sore and is not improved like it should be."  (Tr. 1174.)  Mr. Schiff found that Fusco's "right leg strength has not really improved because of knee pain," noting "he has not responded to the exercise program as hoped."  (Tr. 1174-1175.)

On November 24, 2008, Fusco began treatment with primary care physician Gregory C. Brant, D.O.  (Tr. 518.)  Fusco complained of right knee and left shoulder pain, stating that he "can't handle the pain any more."  (*Id.*)  While Dr. Brant's handwriting is difficult to read, he appears to have assessed partial left rotator cuff tear and acute knee pain.  (*Id.*)  He prescribed Roxicodone.  (*Id.*)  Fusco reported feeling better during a visit in December 2008.  (Tr. 517.)  Dr. Brant assessed the same conditions and continued Fusco's Roxicodone prescription.  (*Id.*)

Fusco presented to Dr. Fumich on seventeen (17) occasions in 2009.  (Tr. 397-402, 681.)  In January 2009, Dr. Fumich noted medial symptoms in Fusco's right knee and assessed chrondritis and arthritis.  (Tr. 397.)  He prescribed Percocet and repeated his request for

8

authorization for Hyalgan injections and a deloader brace.  (*Id.*)  Fusco was granted authorization

to receive Hyalgan injections in February 2009.  (*Id.*)  He received a series of five injections in

his right knee in February and March 2009.[2]  (Tr. 397-398.)

Fusco reported continuing knee pain despite the injections.  (Tr. 399.)  He underwent x-

rays, which Dr. Fumich described as "unremarkable except for some very mild arthritic change."

(*Id.*)  Dr. Fumich ordered an MRI, which was normal.  (*Id.*)  In May 2009, Fusco reported no

improvement in his right knee.  (*Id.*)  Dr. Fumich requested authorization for a Topaz procedure,

which was denied.  (*Id.*)  He then prescribed Percocet and requested a Funk procedure.  (*Id.*)

The following month, Dr. Fumich prescribed Percodan and advised Fusco to use ice.  (Tr. 400.)

On July 14, 2009, Fusco reported he had "fallen down recently because of the pain."

(*Id.*)  Examination revealed "continued pain and discomfort directly over the patellar tendon,

increased with extension, and pain on resisting extension."  (*Id.*)  A week later, on July 21, 2009,

Fusco presented to the ER, stating he had fallen and injured his right knee.  (Tr. 981-982.)  X-

rays showed no acute fracture or dislocation of either knee, although the radiologist did note that

"[a] thin rim of calcification is present adjacent to the right medial femoral condyle, most likely

the sequela of a remote trauma or degenerative change."  (Tr. 911.)  The ER doctor assessed

right/left knee sprain/strain and discharged Fusco home with a knee immobilizer.  (Tr. 982-983.)

Fusco followed up with Dr. Fumich, who recorded medial pain but observed full motion, no

---

[2] Fusco also presented to Dr. Brant on at least four occasions in 2009.  (Tr. 512-516.)  As
Dr. Brant was his primary care physician, Fusco received treatment from him for a
variety of medical conditions during this time period, including hypertension, non-insulin
dependent diabetes mellitus, depression/anxiety, degenerative disc disease, and left
shoulder rotator cuff injury.  (*Id.*)  In addition, during this time period, Dr. Brant
prescribed various medications for these conditions, including Roxicodone for his left
shoulder and right knee pain and Ativan for his anxiety.  (Tr. 512-516, 539-556.)

swelling or effusion, negative grind, and negative pinch flexion.  (Tr. 400.)  Dr. Fumich

recommended ice, anti-inflammatories, and knee immobilizer on the right for 72 hours.  (*Id.*)

Fusco continued to report right knee pain in August, September and October 2009, as

well as pain and "popping" in his hip.  (Tr. 401.)  In November 2009, Dr. Fumich noted slight

effusion, positive grind, and positive pinch flexion.  (Tr. 402.)  He observed that Fusco "is

known to have meniscal injury and chondritis," and stated "[w]e will request authorization for

repeat arthroscopy of the right knee for the recurrent medial symptoms."  (*Id.*)  Dr. Fumich

recorded similar findings in December 2009, but noted that his request for arthroscopy was

denied.  (Tr. 681.)

Meanwhile, Fusco began treatment with William A. Seeds, M.D., on October 5, 2009 for

treatment of his left shoulder pain.  (Tr. 1221-1223.)  Fusco complained of constant left shoulder

pain, which he rated a 10 on a scale of 10.  (Tr. 1221.)  On examination, Dr. Seeds noted positive

impingement, positive crossover anterior capsular pain, full range of motion, no instability and

3/5 muscle tone & strength.  (Tr. 1222.)  Fusco underwent x-rays, which showed "changes [of]

the greater tuberosity consistent with previous injury AC joint tax mild glenohumeral changes."

(Tr. 1222, 1224.)  Dr. Seeds assessed shoulder impingement and "shoulder rotator cuff

tear/rupture traumatic," and noted Fusco had "significant difficulty with elevation in abduction."

(Tr. 1222.)  Two days later, Fusco underwent an MRI of his left shoulder, which showed calcific

tendinitis of the left supraspinatus tendon.  (Tr. 729.)  Fusco received a series of three left

shoulder injections in October and November 2009.  (Tr. 1230-1235.)

Fusco continued to receive treatment for his physical impairments from multiple

physicians throughout 2010.  He presented to Dr. Fumich on at least ten (10) occasions during

this time frame.  (Tr. 679-681.)  In January 2010, Fusco complained of continued right knee pain

with patellar tendinitis with "patellofemoral joint at times feel[ing] locked."  (Tr. 681.)  Dr.

Fumich noted decreased motion due to pain, patellofemoral crepitus, and slight effusion.  (*Id*.)

In March 2010, Fusco reported pain in both knees.  (Tr. 680.)

Fusco returned to Dr. Seeds on March 5, 2010 for a follow up examination regarding his

left shoulder.  (Tr. 1236-1237.)  Fusco reported sharp, constant left shoulder pain, rating it a 10

on a scale of 10.  (Tr. 1236.)  Examination revealed impingement, decreased range of motion,

3/5 muscle tone and strength, and no instability.  (Tr. 1237.)  Dr. Seeds noted Fusco "had a

response for about one month secondary to injections but has continued complaints of

impingement of the shoulder."  (Tr. 1238.)  He recommended left shoulder arthroscopic surgery.

(*Id*.)

On March 19, 2010, Fusco again presented to Dr. Seeds with complaints of constant left

shoulder pain.  (Tr. 1248-1249.)  Dr. Seeds administered injections on March 19 and 26, 2010.

(Tr. 1248-1249, 1251-1252.)  On March 29, 2010, Fusco reported no relief from the injections,

complaining of "constant pain worse with movement."  (Tr. 1253.)  Examination revealed

impingement, decreased range of motion, decreased muscle tone and strength, and no instability.

(Tr. 1254.)  Dr. Seeds noted he had "exhausted all conservative treatment and will progress to

surgery."  (Tr. 1255.)  The record reflects Fusco elected to postpone shoulder surgery due to his

knee pain.  (Tr. 1258.)

Meanwhile, Fusco received authorization for arthroscopic surgery on his right knee.  Dr.

Fumich performed the procedure in June 2010.  (Tr. 680.)  Dr. Fumich noted that, during

surgery, Fusco "was found to have chondritis of medial femoral condyle, chondromalacia of the

11

patella, and synovitis of the patellofemoral joint."  (*Id.*)  Dr. Fumich recommended Fusco begin physical therapy.  (Tr. 679.)

Fusco returned to Mr. Schiff for two physical therapy sessions in June 2010.  (Tr. 1163-1164, 1170-1172.)  In his initial session on June 21, 2010, Fusco described his pain as follows:

> Patient reports that his right knee has been bad for a long time. Patient reports that it just continually and steadily gets worse.  Patient reports that it got to the point where he could not really tolerate the discomfort and he needed something done with it. Patient reports that he is most sore around his kneecap, lateral side, superior and inferior; generally the whole kneecap.  Patient reports that he needs to walk with a cane.  Patient reports that his knee swells after anytime he is up on it.  Patient reports that he cannot bend his knee very well because the kneecap hurts so much.  Patients reports that his strength in the leg is definitely down.

(Tr. 1170.)  On examination, Mr. Schiff noted swelling, tenderness, and reduced range of motion in both the right and left knee.  (*Id.*)  He also observed crepitus, positive compression test, and limited right leg strength.  (Tr. 1171.)

On June 30, 2010, Mr. Schiff noted Fusco "still limps to walk and cannot stand and weight bear for any extended period of time."  (Tr. 1163.)  He observed positive crepitus and compression test, but noted improved range of motion and "slowly improving" leg strength.  (*Id.*)  Mr. Schiff also found that Fusco could not squat, kneel, or "ambulate stairs step-over-step."  (Tr. 1164.)

Fusco returned to Dr. Fumich in July 2010 somewhat improved.  (Tr. 679.)  Dr. Fumich noted atrophy but also observed no effusion, no patellar tendon pain, and good motion.  (*Id.*)  Atrophy was again noted in August 2010 as well as a notation that Fusco "missed two weeks of therapy because he had poison ivy and there was illness in the family."  (*Id.*)  In September 2010, Dr. Fumich noted continued pain and discomfort in Fusco's right knee and indicated that, "because this has gone on for so long," he would request a plasma rich platelet injection of the

12

patellar tendon. (*Id.*) In December 2010, Dr. Fumich noted "continued pain over the patellar tendon but it appears to be milder compared to previous exams with continued pain and atrophy to the knee." (*Id.*)

Fusco continued to present to Dr. Brant in 2010 for various conditions, as well. (Tr. 1139-1142.) In October 2010, Fusco complained that he was "twice as sore as usual." (Tr. 1141-1142.) The following month, he reported a stabbing pain in his shoulder. (Tr. 1140.) During this time period, Dr. Brant assessed (among other things) degenerative joint disease of the knees, degenerative disc disease, and left shoulder rotator cuff tear. (*Id.*) He prescribed various medications, including Roxicodone for pain associated with these conditions. (Tr. 1139-1142, 650-675, 952-978.)

Fusco presented to Dr. Brant on twelve (12) occasions in 2011 and at least five occasions in 2012. (Tr. 1118-1138.) Dr. Brant's treatment notes from this time period reflect Fusco often complained of pain and soreness, particularly in his back, shoulder, and neck. (*Id.*) Dr. Brant continued to prescribe various medications to address Fusco's pain complaints, including Roxicodone, Flexeril, Naprosyn, and Ibuprofen (600 mg). (Tr. 952-978, 999-1024.)

On February 13, 2014, Dr. Brant completed a medical statement[3] regarding Fusco's physical abilities and limitations relating to his social security disability claim. (Tr. 1146-1147.)

---

[3] The signature on this medical statement is illegible. Fusco asserts the statement is authored by Dr. Brant and the Commissioner does not challenge that assertion. The author of the statement identifies himself as Fusco's treating physician for the past 7 years, which is generally consistent with Fusco's treatment history with Dr. Brant. Moreover, the handwriting on the medical statement appears (to this Court) to be identical to Dr. Brant's handwritten treatment notes. In the absence of an objection from the Commissioner, the Court agrees with Fusco that the medical statement at Tr. 1146-1147 was, in fact, written by Dr. Brant.

In his statement, Dr. Brant diagnosed Fusco with various conditions, including severe degenerative joint disease of the right knee, chronic shoulder pain, hypertension, hyperlipidemia, PTSD, chronic anxiety, and major depression.  (Tr. 1146.)  He opined that Fusco had the following limitations and abilities: he could work for one hour in a day; stand for a total of two hours and for 15 minutes at one time; sit for a total of four hours and for 30 minutes at one time; lift 30 pounds occasionally and zero pounds frequently; occasionally bend; and engage in frequent bilateral manipulation.  (*Id.*)  Dr. Brant further concluded that Fusco (1) must periodically alternate sitting and standing to relieve his severe pain; (2) would need more than 15 minute breaks in the morning and afternoon and one hour lunch break that would require him to leave his work station; (3) would be off task more than 15% of the day due to problems with concentration, focus, side effects of medication, and chronic pain; and (4) would be absent more than two times per month due to chronic pain and/or doctor appointments.  (Tr. 1146-1147.)

Additionally, Dr. Brant opined Fusco could not walk one city block or more without rest or severe pain or walk one block or more on rough or uneven ground.  (Tr. 1147.)  Fusco was also unable, in Dr. Brant's opinion, to climb steps at a reasonable pace without the use of a handrail.  (*Id.*)  He determined Fusco would have problems balancing, stooping, crouching and bending, and would need to lie down and/or recline during the day due to fatigue, pain, and stress.  (*Id.*) Finally, Dr. Brant noted that Fusco would require the use of a cane, quad cane, walker wheelchair or other assistive device while engaging in occasional standing and walking. (*Id.*)

Dr. Brant expressly stated that Fusco's symptoms existed in March 2008.  (*Id.*)  He also opined that "[i]n my professional opinion as Chester Fusco's treating physician and based upon a

14

reasonable degree of medical certainty it is my opinion that Chester Fusco has been unable to engage in any remunerative employment since March 2008."  (Tr. 1146.)

### 2. Mental Impairments

The medical record regarding Fusco's mental impairments is not as well-developed as that relating to his physical impairments.  The first mention of mental health concerns appears during a March 2009 visit with Dr. Brant, at which Fusco complained of feeling "really depressed" and "terrible."  (Tr. 513.)  Several months later, in November 2009, Fusco underwent a consultative examination with clinical psychologist Richard C. Halas, M.A. (Tr. 585-588.) This examination is discussed in more detail in the next section; however, it bears noting that Dr. Halas diagnosed Fusco with depressive disorder; generalized anxiety disorder with some phobic features; and polysubstance abuse currently in remission.  (Tr. 588.)  He also assessed a Global Assessment of Functioning ("GAF")[4] of 45 indicating serious symptoms, although he noted that Fusco's "functional severity is above this level, at 55."  (*Id*.)

On April 12, 2010, Fusco began individual psychotherapy sessions with Thomas Cassady, Ph.D.  (Tr. 926-927.)  Dr. Cassady summarized Fusco's "functional status" as follows:

**Activities of Daily Living**– limited driving, limited cooking, some running of errands, TV, very dependent on his daughter.

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

**Persistence, Concentration, Pace**– distractable, poor concentration skills, very slow mental pace.

**Social Functioning**– [Fusco] reports no social life at this time, he spends time with his daughter, he avoids all public activities.

**Adaptation to Stress/Work Stability**– very poor coping skills for everyday stressors, cannot work.

(*Id*.)  Dr. Cassady identified Fusco's short-term goals as reducing depression and anxiety.  (Tr. 927.)  He assessed Fusco's prognosis as "good."  (*Id*.)

The next treatment note in the record from Dr. Cassady is dated October 6, 2010.  (Tr. 923-924.)  According to this note, Fusco appeared for treatment sessions on a bi-weekly basis since his initial visits, including on April 26, May 14, May 28, June 14, June 29, July 14, July 28, and October 1.  (*Id*.)  Dr. Cassady noted no significant changes in Fusco's activities of daily living or social functioning.  (*Id*.)  He observed "improved concentration skills" but "still very slow mental pace" and "still very poor coping skills for everyday stressors."  (Tr. 923-924.)  Dr. Cassady summarized Fusco's progress as follows:

[Fusco] has completed 10 sessions during this auth[orization] period.  He does have difficulty making and keeping appts due to his depression and his forgetfulness.  Chet is doing better with this in the last several weeks.  He has shown some improvement in his sadness, fatigue, and irritability.  Chet is also very straight forward and honest in his approach to this therapy.  He continues to need help with his anger, fears of public places, fear of leaving home, liking people, and hopelessness.  He continues to be a good therapy candidate.  He continues to need his every 2-week tx. . . . He may be a candidate for further psychotropic medication.  We will continue on our every 2-week therapy schedule.

(Tr. 924.)  The parties do not direct this Court's attention to any records indicating further treatment with Dr. Cassady.

In October, November, and December 2010, Fusco presented to Dr. Brant, who

16

diagnosed PTSD and prescribed Xanax.  (Tr. 1139-1142.)  Fusco continued to present to Dr.

Brant on a monthly basis throughout 2011.  (Tr.  1126-1138.)  Treatment notes from each of

these visits reflect diagnoses of PTSD and Xanax prescriptions.  (*Id*.)  In November 2011, Fusco

reported his psychiatrist indicated he "needed to be put on an anti-depressant."  (Tr. 1126.)  Dr.

Brant prescribed Citalopram (also known as Celexa.)  (Tr. 1125.)  The following month, Fusco

reported that he was "under a lot of stress."  (*Id*.)  Fusco presented to Dr. Brant in 2012, during

which time Dr. Brant continued to diagnose PTSD, depression and/or anxiety, and prescribe

Xanax.  (Tr. 1118-1123.)

In February 2014, Dr. Brant completed a Medical Source Statement regarding Fusco's

"symptoms associated with pain or depression or anxiety."  (Tr. 1143-1144.)  Dr. Brant opined

that Fuso's pain was severe and that it exacerbated his mental health.  (Tr. 1143.)  He found

Fusco exhibited the following symptoms: pervasive loss of interest in almost all activities, sleep

disturbance, crying spells, psychomotor agitation or retardation, decreased energy, and difficulty

concentrating or thinking.  (Tr. 1143.)  Dr. Brant concluded Fusco was markedly restricted in

activities of daily living, social functioning, and maintaining concentration, persistence or pace.

(Tr. 1144.)  He found Fusco's pain and stress were frequently severe enough to interfere with

attention and concentration needed to perform simple work tasks.  (*Id*.)  Dr. Brant also opined

Fusco was likely to be (1) absent from work as a result of his physical and/or mental

impairments for 5 days or more month, and (2) unable to complete an 8 hour workday for 5 days

or more per month.  (*Id*.)  He concluded that, compared to an average worker, Fusco could

efficiently be expected to perform a full-time job on a sustained basis only 60% of the time.  (*Id*.)

Finally, Dr. Brant found that, because of his medical impairments, Fusco was unable to obtain

and retain work in a competitive work environment on a full-time basis.  (*Id.*)

**C.      State Agency Reports**

**1.      Physical Impairments**

**a.      Bureau of Workers' Compensation ("BWC") Reports**

Fusco underwent several independent medical examinations at the request of the Ohio

Bureau of Workers' Compensation.  The first of these was performed by Oscar F. Sterle, M.D.,

on March 31, 2009.  (Tr. 861-872.)  After a lengthy discussion of Fusco's medical records, Dr.

Sterle recounted Fusco's chief complaints as follows: "The examinee complains of right knee

pain and cannot stand on the right leg and cannot walk or climb stairs.  Has to use a came for

ambulation.  The knee occasionally swells up and feels stiff, cracks and pops.  The claimant also

complains of pain in the right hip and occasional low back pain and no pain in the left ankle."

(Tr. 866.)

On examination, Dr. Sterle noted that Fusco had a "significant limp on the right" and that

he experienced "difficulty rising on his toes and heels or squat[ting] due to pain in the right

knee."  (Tr. 869.)  Dr. Sterle observed no evidence of effusion, swelling, or redness; however,

Fusco exhibited "global tenderness of the right knee" upon palpation.  (*Id.*)  He also noted "give-

way type of weakness of the quadriceps and hamstrings due to pain," as well as crepitus in the

right knee and decreased range of motion in both knees.  (*Id.*)  Dr. Sterle further observed 5/5

strength; intact sensory in the lower limbs; and full range of motion in Fusco's right hip.  (Tr.

870.)

Dr.  Sterle then reached the following conclusions: (1) Fusco "has not reached maximum

medical improvement for the degenerative condition involving the right knee;" (2) he "remains

18

symptomatic under the allowed condition of 'chondritis of the right knee,' which did not

improve with viccosupplementation injection;" (3) he could not return to his former position of

employment at the time of the examination; and (4) "vocational rehabilitation is an option."  (Tr.

871.)  He further concluded that "[t]he conservative treatment should continue for the right knee

including home-based knee exercises, losing weight, and anti-inflammatory medication."  (Tr.

872.)

Several months later, in October 2009, Fusco underwent an independent medical

examination with Gregory A. Moten, D.O.  (Tr. 856-859.)   At this examination, Fusco

complained of "catches" in his right hip/right knee and pain in his right knee, low back, left

knee, and left elbow.  (Tr. 857.)  He stated that the "pain is severe, a 9-10 out of 10, and

constant."  (*Id.*)  Fusco claimed nothing relieved the pain and it caused him to have "difficulty

with self-care, physical activity, hand function, travel, and sleep."  (*Id.*)

Examination revealed +2 pitting edema, swelling, and sharp tenderness in Fusco's right

knee.  (*Id.*)  Dr. Moten also noted that Fusco's gait was assisted with a walker and his stance and

balance were unstable.  (*Id.*)  He recorded a positive Lachman sign and negative Drawer sign.

(*Id.*)

Dr. Moten concluded, within a "reasonable medical probability," that Fusco "has not

reached maximum medical improvement for the allowed conditions in this claim," noting in

particular that he has "not recovered or improved" from his previous knee surgeries.  (Tr. 858.)

Dr. Moten further found Fusco was "not capable of any work due to medical instability and

pain" and that "vocational rehabilitation [was] not recommended."  (Tr. 858-859.)  He found that

"[a] recommended treatment plan would include a right knee replacement if recommended by

POR."  (Tr. 859.)

On December 29, 2010, Fusco underwent a third independent medical examination, this time with Arsal Ahmad, M.D.  (Tr. 843-847.)  Fusco complained of "severe constant pain in the right knee, right hip, lower back, and increasing pain in the left knee."  (Tr. 844.)  He reported "difficulties with activities of daily living including self-care, physical activity, lifting, driving, and sleeping."  (*Id*.)  Examination of the right knee revealed limited range of motion, tenderness, and "an antalgic gait pattern . . . with the use of a walker."  (*Id*.)  Dr. Ahmad also, however, noted no evidence of instability and intact sensation.  (*Id*.)

Dr. Ahmad concluded that: "The injured worker has not reached a treatment plateau that is static and well stabilized. He continues to have persistent pain in the right knee which has not significantly improved despite multiple surgeries.  It is still possible with ongoing treatment that a fundamental or functional change in his condition can still be expected."  (Tr. 845.)  He further found that Fusco was "not capable of returning to his former position of employment" and vocational rehabilitation was not recommended "at this time."  (*Id*.)  Dr. Ahmad's recommendation for further treatment included "continued medication management and consideration for any further procedures which may be beneficial," including a partial knee replacement for "persistent knee pain which has been refractory to most arthroscopic procedures."  (Tr. 846.)

In addition, Dr. Ahmad completed a "Report of Work Ability" regarding Fusco's physical functional abilities for the time period December 2010 to March 2011.  (Tr. 847.)  In this Report, Dr. Ahmad stated Fusco could occasionally (i.e., for 1-33% of an 8 hour workday) bend, twist/turn, and sit.  (*Id*.)  He found Fusco could not lift or carry any amount of weight,

20

reach below the knee, push/pull, squat/kneel, stand/walk, or lift above the shoulders.  (*Id.*)

### b.    SSA Physician Opinions

On January 14, 2010, state agency physician W. Jerry McCloud, M.D., reviewed Fusco's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 603-610.)  He noted a primary diagnosis of status post medial meniscal tear right knee, and a secondary diagnosis of status post arthroscopic surgery.  (Tr. 603.)  Dr. McCloud found Fusco was capable of lifting 50 pounds occasionally and 25 pounds frequently; standing and/or walking for a total of six hours in an eight hour workday; and sitting for a total of six hours in an eight hour workday.  (Tr. 604.)  Dr. McCloud further found Fusco had unlimited push/pull capacity but (due to his knee pain) could only occasionally climb ladders/ropes/scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently climb ramps/stairs and balance.  (Tr.  604-605.) He further found Fusco had no manipulative or environmental limitations.  (Tr. 606-607.)

On June 21, 2012, state agency physician Maria Congbalay, M.D., reviewed Fusco's medical records and completed a Physical RFC Assessment.  (Tr. 80-82.)  Dr. Congbalay indicated her assessment was a "current evaluation."  (Tr. 80.)  She opined that Fusco was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of six hours in an eight hour workday; and sitting for a total of six hours in an eight hour workday.  (Tr. 80.)  Dr. Congbalay further found Fusco had unlimited push/pull capacity but (due to his right knee injury) could never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, and frequently balance, stoop, kneel, crouch, and crawl.  (Tr. 80-81.)  She further found Fusco was limited to frequent overhead reaching with his left shoulder due to calcific tendonitis.  (Tr. 81.)  Finally, she found Fusco should avoid even moderate exposure to hazards,

including climbing and unprotected heights.  (Tr. 82.)

On November 7, 2012, state agency physician Esberdado Villanueva, M.D., reviewed Fusco's medical records and completed a Physical RFC Assessment.  (Tr. 94-96.)  Dr. Villanueva also indicated that his assessment was a "current evaluation."  (Tr. 94.)  Dr. Villanueva reached the same conclusions as Dr. Congbalay regarding Fusco's physical functional limitations.   (Tr. 94-96.)

### 2.    Mental Impairments

### a.    BWC Reports

In April 2010, at the request of the Ohio BWC, Fusco underwent a psychological examination with Cheryl Benson-Blankenship, Ph.D.  (Tr. 849-855.)  Fusco reported little motivation "to do much of anything."  (Tr. 850.)  He experienced anxiety attacks beginning in 2000 and "worrie[d] about everything," particularly about dying.  (Tr. 851.)  He reported daily panic attacks causing sweating, trembling, breathing problems, and pounding of the heart.  (*Id*.) He "does not prefer to leave the home because the situations outside the home may precipitate another attack."  (*Id*.)  Fusco also reported "a significant level of depression," which he described as follows:

> He indicated that he is sad much of the time.  He feels his future is hopeless and that it will only get worse.  He gets very little pleasure from the things that he used to enjoy.  He cries more than he used to.  He has lost confidence in himself.  He is more critical of himself than he used to be.  Mr. Fusco noted that he feels more restless than he used to.  He finds it hard to become interested in anything.  He has no energy to do anything.  He is more irritable than usual. Mr. Fusco is too tired to do the things he used to do.  He wakes up several hours early, and cannot go back to sleep.  He has trouble making decisions now.

(Tr. 852.)

Examination revealed "evidence of depression and panic disorder with agoraphobia."

22

(*Id.*)  Fusco was oriented to person, place, time and situation, but his affect was mildly constricted.  (*Id*.)  His insight and judgment were intact, and his speech was coherent, logical and organized.  (*Id*.)  His immediate, short-term, and long-term memory functions were "mildly impacted by somatic concerns, depression, and panic disorder."  (*Id.*)

Dr. Benson-Blankenship diagnosed major depressive disorder, single episode, moderate; and panic disorder with agoraphobia.  (*Id.*)  She assessed a current GAF of 56, and a past GAF of 59, indicating moderate symptoms.  (Tr. 853.)  Dr. Benson-Blankenship concluded Fusco "is in need of five to six months of mental health treatment on a consistent basis," including counseling on a weekly to bi-weekly basis with concurrent psychiatric assessment and ongoing psychopharmological supervision.  (Tr. 855.)

Several months later, in November 2010, Fusco underwent a psychiatric evaluation with Douglas A. Smith, M.D.  (Tr. 906-907.)  Fusco reported sadness, fatigue, irritability, anger, fear of leaving the house, fear in general, difficulty with others, and "fleeting hopelessness."  (Tr. 906.)  He also complained of poor concentration and sleep.  (Tr. 907.)  Examination revealed slightly constricted affect, but no evidence of mania or psychosis.  (*Id*.)  Fusco's thoughts were logical and goal-directed, his concentration and memory were intact, and he showed "fair insight and good judgment."  (*Id*.)  Dr. Smith assessed depressive disorder and panic disorder.  (*Id*.)  He recommended Fusco begin Cymbalta, as well as continue Xanax.

**b.    SSA Physician Opinions**

On November 2, 2009, Fusco underwent a consultative psychological examination with Richard C. Halas, M.A.  (Tr. 585-588.)  Fusco reported sleep problems, crying spells, low energy, high levels of anxiety, and feelings of hopelessness, helplessness, and worthlessness.

23

(*Id*.)  Dr. Halas noted Fusco was oriented in all three spheres, cooperative, and appropriately motivated during the evaluation.  (Tr. 585.)  He was, however, disheveled and "generally unkempt," with a flat and shallow affect.  (*Id*.)  He was frequently tearful with a "flat, hesitant, and tentative presentation," and "generally tended to minimize and/or deny problems." (*Id*.)  His speech pattern was slow, hesitant, and constricted; eye contact was poor; and he demonstrated psychomotor retardation.  (Tr. 585-586.)  In addition, Fusco showed "high levels of anxiety" during the examination, including fidgeting and damp, trembling hands.  (Tr. 586.)

He did not, however, have any specific problems with fragmentation of thought or flight of ideas.  (Tr. 585.)  Dr. Halas found Fusco's responses were coherent and relevant, although he showed a "marked poverty of speech."  (*Id.*)  Fusco's overall quality of consciousness was good, and he was reasonably oriented in time, place, and person.  (Tr. 586.)  His short and long term memory was good and he was "quickly able to do simple calculations and was fast and accurate in doing serial 7's."  (*Id*.)  Dr. Halas estimated Fusco's general intelligence level as average. (*Id*.)

Fusco reported he was up most days by noon.  He cared for his 18 month old grandchild and watched television.  (Tr. 587.)  He stated he and his daughter shared in all the household chores.  (*Id.*)  He reported few friends.  (*Id.*)  Dr. Halas noted that Fusco ambulated with a cane, but opined he would have "little or no difficulty sitting."  (*Id*.)  Dr. Halas also remarked that "standing, walking, lifting, carrying, and handling of objects are assessed as being poor and below average."  (*Id*.)

Dr. Halas diagnosed depressive disorder; generalized anxiety disorder with some phobic features; and polysubstance abuse, currently in remission.  (Tr. 588.)  He assessed a GAF score

of 45 "for serious symptoms," noting Fusco "has significant psychological issues." (*Id.*) He

found, however, that Fusco's functional severity was slightly higher, at 55. (*Id.*) With regard to

Fusco's mental abilities, Dr. Halas found as follows:

1.     The client's mental ability to understand, remember, and follow
       instructions and/or directions remains intact and not impaired.
       During the mental status testing, the client was estimated to have
       average intellect.

2.     The client's mental ability to maintain attention and concentration to
       perform simple, repetitive tasks is intact and not impaired. The client
       recalls seven digits forwards and was quickly able to do Serial 7s.

3.     The client's mental ability to relate to others, including fellow
       workers and supervisors, shows to have moderate impairment.
       Symptoms of depression and anxiety are likely to restrict the client's
       ability to be appropriate and effective with others.

4.     The client's ability to withstand the stresses and pressures associated
       with day to day work settings is assessed as having moderate
       impairment. The client's psychological and emotional problems are
       likely to become exacerbated under the pressures of a normal work
       setting.

(Tr. 588.)

The following month, in December 2009, state agency physician Vicki Warren, Ph.D.,

reviewed Fusco's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr.

589-601.) She concluded Fusco's depressive disorder and generalized anxiety disorder were not

severe, explaining as follows:

The claimant did not allege psychological problems as a cause for his
disability.[5] He alleges knee problems. However, he did mention that he
attended AA meetings therefore a psychological exam was ordered. He was
evaluated by Richard A. Halas, MA on 11/20/99. He was diagnosed with

---

[5] This statement is incorrect. In addition to his physical problems, Fusco identified
"severe anxiety and depression" in his disability applications. (Tr. 73-74.)

25

> depression NOS, Generalized Anxiety Disorder with some phobic features
> and polysubstance abuse. His GAF was 55. Significant weight is given to the
> opinions of Richard Halas, M.A. Most of his limitations are due to his
> physical problems. He spends his time watching crime stories and sports on
> television. He spends time with his children and grandchildren. His
> limitations are due to his knee pain. He no longer rides his Harley Davidson
> or goes camping due to knee pain. He had to stop work because of knee pain.
> No severe psych impairment can be established.

(Tr. 601.) In particular, she found Fusco was not limited in his activities of daily living or

maintaining concentration, persistence, or pace; and only mildly limited in social functioning.

(Tr. 599.)

In July 2012, state agency physician Roseann Umana, Ph.D., reviewed Fusco's medical

records and completed a PRT. (Tr. 78-79.) She concluded there was "insufficient evidence" to

establish a mental disorder, noting that "claimant has failed to return functional information to

this office despite repeated requests by phone, by mail, and to third parties." (Tr. 79.)

Thereafter, in December 2012, state agency physician Cynthia Waggoner, Psy.D.,

reviewed Fusco's medical records and completed a PRT. (Tr. 92-93.) Dr. Waggoner also found

insufficient evidence to fully evaluate Fusco's mental conditions. (Tr. 93.)

**D.    Hearing Testimony**

During the February 26, 2014 hearing, Fusco's testimony was limited to a discussion of

his past work experience.[6] He testified that, from 1993 until approximately 2006, he performed

---

[6] Fusco's counsel testified he had only recently been hired and was still familiarizing
himself with the medical record. (Tr. 53.) The ALJ agreed to take testimony from Fusco
regarding his past work only, so that the VE could identify and classify Fusco's
past work under the Dictionary of Occupational Titles ("DOT"). (*Id*.) In order to allow
Fusco's counsel the opportunity to develop the record, the ALJ agreed to schedule
another hearing several months later to take testimony regarding Fusco's medical
conditions. (Tr. 70.)

the following jobs:  road flagman, electrical painting and sign wiring, hazardous waste clean-up, gas station stocker/cashier, and vinyl siding work.  (Tr. 56-64.)   Fusco confirmed he had no reported income from 2006 to 2013.   (Tr. 66-67.)  He testified he supported himself during this time period by relying on his workers' compensation claim settlement as well as a large settlement received by his brother.  (Tr. 66- 68.)

The VE testified Fusco had past work as a (1) sign erector (DOT 869.381-026) (medium, skilled, SVP 7); (2) equipment operator (DOT 859.683-010) (medium per the DOT but heavy as performed, skilled, SVP 6); and (3) gas station attendant (DOT 211.462-010) (light, unskilled, SVP 2).  (Tr. 69.)

During the May 19, 2014 hearing, Fusco testified to the following:

- He completed the tenth grade but quit school in the middle of eleventh grade. (Tr. 42.)  He has not completed his GED.  (*Id*.)  In 2008, he was living in a house with his girlfriend.  (Tr. 39.)  After his daughter and grandchild moved in, his girlfriend moved out.  (*Id*.)

- His right knee has been "pretty shot, bone on bone" since 2007.  (Tr. 34.) Between 2008 and 2010, he could stand for no more than 20 to 25 minutes and walk for only 10 to 15 minutes before needing to sit down.  (Tr. 34-35.)

- He tore his left shoulder when he fell down the steps.  (Tr. 37-38.)  He has had injections but they did not help relieve his pain.  (Tr. 35, 37.)  During the 2008 to 2010 time frame, he could not reach overhead or to the front.  (Tr. 35.)  He could lift a gallon of milk, but only if he used both hands.  (*Id*.)

- He has seen a psychologist about his depression.  (Tr. 38.)  Three to four years prior to the hearing, he was "not [feeling] very good" emotionally or mentally. (*Id*.)

- He has a history of drug and alcohol abuse, however, it is no longer "an issue." (Tr. 41.)  He checked himself into an inpatient substance abuse program in November 2007 and was there for eighteen days.  (*Id*.)  Since that time, he has "done absolutely nothing."  (Tr. 41-42.)

The ALJ reminded the VE that Fusco had past work as a sign erector, equipment

27

operator, and gas station attendant.  (Tr. 31.)  She asked the VE to assume an individual similar

to Fusco in age and education.  (Tr. 42.)  The ALJ then posed the following hypothetical

question:

> All right.  This individual can engage in light exertion, never climb any ladders,
> ropes or scaffolds, occasionally climb ramps and stairs.  Can frequently stoop,
> kneel, crouch, and crawl, is limited to reaching overhead frequently with the left
> arm, no limits on the right.  Avoid exposure to unprotected heights and no mental
> limitations.  As you review the claimant's past work can you tell me whether or
> not there is any work consistent with the claimant's past work that could still be
> performed?

(Tr. 42.)  The VE testified the hypothetical individual would be able to perform Fusco's past

work as a gas station cashier.  (Tr. 43.)

The ALJ then posed a second hypothetical that was the same as the first, but added the

following mental limitations:

> All right.  Hypothetical number two we're going to add mental limits.  And the
> mental limits will be: can understand, remember and carry out instructions
> consistent with performing work at SVP 1 to SVP 4, or work that is further
> defined as work that can be learned within six months.  As far as maintaining
> concentration, persistence and pace, we're going to say can maintain
> concentration, persistence and pace for I'm going to say two-hour blocks of time
> * * * before having a break and we'll say before having a 15 minute break.  As far
> as social can interact with general public, coworkers and supervisors and can
> adjust to routine type changes in the work place setting.  As you review this
> hypothetical can you tell me whether or not there is any work consistent with the
> claimant's past work that could still be performed?

(Tr. 43.)  The VE testified the hypothetical individual would still be able to perform Fusco's past

work as a gas station cashier.  (Tr. 44.)

The ALJ then posed a third hypothetical as follows:

> All right, hypothetical number three. Medium exertion, occasionally climb
> ladders, ropes and scaffolds, stoop, kneel, crouch, and crawl can also be
> performed occasionally.  Frequently climb ramps and stairs and frequently
> balance, no mental limitations.  As you review this hypothetical, can you tell me

28

> whether or not there is any work consistent with the claimant's past work that could still be performed?

(Tr. 44.)  The VE testified the hypothetical individual would be able to perform all three jobs;

i.e.,  sign erector, equipment operator, and gas station cashier.  (*Id*.)

> The ALJ then asked a fourth hypothetical, as follows:

> Hypothetical number four we're going to build upon hypothetical number two. And that is a light exertion, never climb any ladders, ropes and scaffolds, occasionally climb ramps and stairs and so forth.  I'm going to now limit the reaching overhead to bilaterally.

> > VE:      To frequently?

> Yes.  Limited to reaching overhead bilaterally, frequently with the left arm.  I mean, I'm sorry, bilaterally, and that's going to be – yeah, eliminate that, let me cut that out.  And everything else remains the same including, including mental. How that does that impact your answer, sir?

(Tr. 44.)  The VE testified the hypothetical individual would be able to perform Fusco's past

work as a gas station cashier.  (Tr. 45.)

> The ALJ then asked a fifth hypothetical that was the same as the fourth, but it

"increase[d] the limitation to reaching overhead to occasional."  (Tr. 45.)  The VE again testified

the hypothetical individual would be able to perform Fusco's past work as a gas station cashier.

(*Id*.)

> The ALJ next asked the VE the following question: "how does your answer change . . . if

in any of the . . . light hypotheticals we said the claimant was limited to standing and walking to

four hours?"  (Tr. 46.)  The VE testified the hypothetical individual would not be able to perform

the gas station cashier job without accommodation.  (*Id*.)  After further discussion, the VE stated

that, with this additional limitation, he would reduce the cashier job to a sedentary job "because

they're sitting four of eight hours a day."  (Tr. 47.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Fusco was insured on his alleged disability onset date, March 3, 2008 and remained insured through December 31, 2010, his DLI.  (Tr. 11.)  Therefore, in order to be entitled to POD and DIB, Fusco must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 3, 2008 through his date last insured of December 31, 2010 (20 CFR 404.1571 et seq.)

3.    Through the date last insured, the claimant had the following severe impairments: osteoarthritis of the right knee (partial medial and lateral meniscectomy) (hereafter "right knee impairment"); and left shoulder tendinitis (hereafter "left shoulder impairment") (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that,

through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant was never to climb any ladders, ropes, or scaffolds and he was limited to no more than occasional climbing of ramps and stairs; the claimant was limited to no more than frequent stooping, kneeling, crouching, or crawling; the claimant was limited to no more than frequent reaching overhead with the left arm, with no limitations as to the right arm; and finally, the claimant needed to avoid exposure to unprotected heights.

6.      Through the date last insured, the claimant was capable of performing past relevant work as a gas station attendant. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from March 3, 2008, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(f)).

(Tr. 11-23.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*,

32

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.*

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**      ***Opinion Evidence Regarding Fusco's Physical Functional Limitations***

In his second assignment of error (which the Court elects to address first), Fusco argues the ALJ erroneously relied on the assessments of record-reviewing state agency physicians Congbalay and Villanueva in fashioning the RFC.  (Doc. No. 15 at 22.)   He maintains the ALJ's "complete reliance" on these physicians' opinions is flawed because the opinions address an incorrect period and are not based on the whole record.  (*Id*. at 23.)  Fusco further argues the ALJ erred in the weight assigned to the other opinion evidence in the record, including the opinions of treating physician Dr. Brant, physical therapist Mr. Schiff, and BWC physician Dr. Ahmad. (*Id*. at 24-27.)  In sum, he maintains that "[t]he ALJ's finding that there is a lack of evidence prior to the claimant's date last insured to support greater limitations than those assessed in her ultimate [RFC] is not supported" by substantial evidence.  (*Id*. at 27.)

The Commissioner argues the RFC is based on the ALJ's thorough review of the record and is supported by substantial evidence.  (Doc. No. 17 at 14.)  She disputes Fusco's assertion that the opinions of Drs. Congbalay and Villanueva were "current assessments," arguing these physicians considered Fusco's impairments from his March 2008 onset through 2012, "which

34

would have covered the entire relevant period."  (*Id*. at 15.)  The Commissioner further claims the ALJ specifically considered and reasonably rejected the opinions of Mr. Schiff and Dr. Ahmad.  (*Id*. at 16-19.)  With regard to Dr. Brant, the Commissioner acknowledges that "the ALJ did not specifically discuss [Dr. Brant's opinion regarding Fusco's] physical limitations," but offers several reasons why the ALJ "could have" reasonably rejected it.  (*Id*. at 17-18.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6ᵗʰ Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6ᵗʰ Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id*.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id*. § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*,

2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[7]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

_____

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

36

particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[8]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of

---

[8] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ recognized Fusco suffered from the severe impairments of osteoarthritis of the right knee (partial medial and lateral meniscectomy) and left shoulder tendinitis.  (Tr. 13.) The decision briefly recounts Fusco's self-reported limitations, noting summarily that Fusco had alleged "functional and postural difficulties (sitting, lifting, standing, walking, climbing, squatting, bending, reaching, and kneeling), knee and shoulder pain, and extremity numbness or sensory change."  (Tr. 17.)  The decision then sets forth a cursory discussion of the medical evidence regarding Fusco's right knee and left shoulder impairments, consisting of no more than two paragraphs.  (Tr. 18.)

The ALJ concluded Fusco's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not fully credible."  (Tr. 17.)  In making this finding, the ALJ noted that (1) "objective findings upon clinical examination were not indicative of limitations preventing Fusco from performing basic work activities;" (2) Fusco's activities of daily living "strongly suggest" he was capable of working; (3) "portions of [Fusco's] treatment have been exceptionally conservative in nature;" and (4) inconsistencies in the record regarding Fusco's subjective reports called into question his credibility, including inconsistent

38

statements regarding his daily activities and drug use.  (*Id.*)  Finally, the ALJ noted that "the

assessment found herein is more or less consistent with that of the State agency consultants."

(*Id.*)

The ALJ then evaluated the opinion evidence.  With regard to physical therapist Mr.

Schiff, the ALJ gave "little to no weight" to his opinions regarding Fusco's postural or exertional

abilities.  The ALJ explained:

> The undersigned has taken into consideration the claimant's physical therapy
> reports (such as those at Exhibit 21F), whereat there is indicia as to a "limp" and
> difficulty with stairs, squatting, and kneeling.  Nevertheless, said reports and
> opinions touch on the claimant's status as disabled, which is an issue reserved
> for the Commissioner. . .. Moreover, a physical therapist is not an "acceptable
> medical source" to establish the claimant's severe impairment under 20 CFR
> 404.1513(d)(1) and 416.931(d)(1) and SSR 06-03p, nor is a physical therapist an
> acceptable source for opinions under 20 CFR 404.1513(d)(1), 416.931(d)(1),
> and SSR 06-03p.  Consequently, although considered, little to no weight is
> afforded opinions supplied by a physical therapist as to postural or exertional
> ability.

(Tr. 18.)  As for non-examining state agency physicians Drs. Congbalay and Villanueva, the ALJ

afforded "great weight" to these doctors' opinions, explaining as follows:

> The undersigned affords great weight to the assessments of State agency medical
> consultants' Esberdado Villanueva, M.D. and Maria Congbalay (Exhibits 5A;
> 2A). Dr. Villanueva and Dr. Congbalay opined that the claimant, during the period
> in question, would have been capable of work at the less than full range of the
> light exertional level, with similar postural, reaching, and environmental
> limitations as found assessed herein.  I find that Dr. Villanueva's assessment
> objective in nature and supported by medical evidence in record.  For example,
> there is a lack of indicia during the period in question as to significant focal
> deficits that would support greater limitations than those assessed herein.

(Tr. 19.)  The ALJ gave "partial weight" to the opinion of non-examining state agency physician

Dr. McCloud that Fusco was capable of a reduced range of medium work, finding that "based

upon the claimant's shoulder impairment, the undersigned finds the claimant more limited than

39

previously determined by Dr. McCloud." (*Id.*)

With regard to the BWC medical examinations performed by Drs. Sterle, Moten, and Ahmad, the ALJ gave each of these reports "little weight." (Tr. 21.)  In each case, the ALJ found the examinations were "without objective documentation as to the significant symptomology that would support greater limitations than those assessed herein." (*Id.*)  The ALJ acknowledged these physicians' findings that Fusco used a cane or walker and displayed some abnormal clinical signs. (*Id.*)  However, the ALJ also highlighted "normal" examination findings, such as full motor strength, intact sensory, good pulse, and minimally decreased range of motion. (*Id.*)  With regard to each of these physicians' opinions that Fusco had not yet obtained maximum medical improvement and was incapable of employment, the ALJ noted that the final determination concerning the conclusion of whether or not a claimant is "disabled" is reserved to the Commissioner. (*Id.*)  Lastly, the ALJ rejected Dr. Ahmad's opinion that Fusco is unable to lift and carry even ten pounds on the grounds it was "inconsistent with the weight of the record and there is a lack of indicia that Dr. Ahmed [sic] performed specific testing as to lifting and carrying, which the undersigned finds to be indicia that Dr. Ahmed's [sic] report was based upon the claimant's subjective reports." (*Id.*)

Finally, the ALJ afforded "little to no weight to the medical source statement (MSS) provided by Dr. Brandt [sic] (Exhibit 20F)." (Tr. 22.)  The ALJ explained as follows:

> First of all, the signature related to said MSS is illegible.  The Regulations require that the opinion be evaluated under 20 CFR 404.1513, 416.913, and SSR 06-03p.  Pursuant to the foregoing, the illegible signature is assessed as one coming from a non-acceptable source for opinions.  Nevertheless, even if the undersigned were to find that said MSS was supplied by Dr. Brandt [sic], said opinion was supplied in 2014, a period *substantially* subsequent to the claimant's DLI; moreover, said MSS is conspicuously inconsistent with the weight of the record.  For example, the individual supplying said MSS,

40

presumably Dr. Brandt [sic], opined that the claimant has marked restriction as to his activities of daily living, social functioning, and concentration, persistence, and pace.  However, said opinion is inconsistent with the claimant's exceptionally meager psychiatric treatment, consisting of no more than prescribed medications and without inpatient psychiatric hospitalization or any type of individualized mental health treatment.  Moreover, Dr. Brandt [sic]opined that the claimant's "stress" is so severe as to frequently (2/3 out of an 8 hour workday) interfere with attention and concentration.  This opinion is inconsistent with psychiatric examination that documented the claimant as without symptomology as to deficits in attention or concentration (Exhibit 7F; 14F/65).  Therefore, even if said MSS were to have been supplied by Dr. Brandt [sic], said MSS is afforded little weight, as it is conspicuously inconsistent with the weight of the objective record.

(Tr. 22) (emphasis in original).  As the Commissioner concedes, the ALJ decision does not discuss Dr. Brant's opinion regarding Fusco's physical functional limitations.

In the RFC, the ALJ found Fusco was capable of "perform[ing] light work[9] as defined in 20 CFR 404.1567(b) except that the claimant was never to climb any ladders, ropes, or scaffolds and he was limited to no more than occasional climbing of ramps and stairs; the claimant was limited to no more than frequent stooping, kneeling, crouching, or crawling; the claimant was limited to no more than frequent reaching overhead with the left arm, with no limitations as to the right arm; and finally, the claimant needed to avoid exposure to unprotected heights."  (Tr. 16.)

The Court finds the ALJ failed to properly weigh the opinion evidence regarding Fusco's physical impairments.  As an initial matter, the ALJ failed entirely to acknowledge or

---

[9] Light work is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 CFR § 404.1567(b).

address Dr. Brant's February 2014 opinion regarding Fusco's *physical* functional limitations.

(Tr. 1146-1147.)  It is uncontested that Dr. Brant was Fusco's treating physician during the

relevant time period.  Indeed, the record reflects Fusco presented to Dr. Brant on numerous

occasions between November 2008 and Fusco's DLI of December 2010.[10]  (Tr.  512-518, 1139-

1142.)  Because Dr. Brant constituted a "treating source," the ALJ was required to determine

whether Dr. Brant's February 2014 opinion regarding Fusco's physical functional limitations was

entitled to "controlling weight."  *Gayheart*, 710 F.3d at 376.  If not, the ALJ was required to

weigh Dr. Brant's opinion based on the factors set forth in 20 CFR 1527(c), including the length,

frequency, nature and extent of the treatment relationship, and the degree to which the opinion is

consistent with the record as a whole and supported by relevant evidence.  *Id*.  To the extent the

ALJ discounted the weight given to Dr. Brant, she was required to provide "good reasons" for

doing so; i.e., "reasons that are supported by the evidence in the case record and . . . sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion."  *Id.*

The ALJ clearly failed to do so.  While the ALJ discussed Dr. Brant's opinions

regarding Fusco's *mental* functional limitations at some length, she did not acknowledge or

address Dr. Brant's opinions regarding Fusco's *physical* functional limitations;[11] i.e., that he

---

[10]   The record also indicates Fusco regularly visited Dr. Brant well after his December
2010 DLI, presenting to him on twelve occasions in 2011 and at least five occasions in
2012.  (Tr. 1118-1138.)

[11] Due to the illegibility of the signature on the MSS regarding Fusco's mental
limitations, the ALJ expressed some doubt as to its authorship.  The Commissioner does
not, however, dispute that Dr. Brant authored the February 2014 statement regarding
Fusco's physical functional limitations (located at Tr. 1146-1147 or "Exhibit 20F/4-5").
Based on its own review, the Court agrees with Fusco that the opinion at issue was

could stand for a total of two hours and for 15 minutes at one time; sit for a total of four hours and for 30 minutes at one time; lift 30 pounds occasionally and zero pounds frequently; occasionally bend; and engage in frequent bilateral manipulation.  (*Id.*)  Nor did the ALJ acknowledge or address Dr. Brant's opinions that Fusco (1) must periodically alternate sitting and standing to relieve his severe pain; (2) would need more than 15 minute breaks in the morning and afternoon and one hour lunch break that would require him to leave his work station; (3) would be off task more than 15% of the day; (4) would be absent more than two times per month due to chronic pain and/or doctor appointments; and (5) would require a cane, walker, or other assistive device while engaging in standing and walking.  (Tr. 1146-1147.)  As the RFC did not contain any of these restrictions, it is clear the ALJ implicitly rejected them.  The ALJ's failure to address these opinions is significant because there is no VE testimony that an individual with one or more of these limitations would be capable of either Fusco's past relevant work or other jobs in the national economy.

The Commissioner argues the ALJ "could have" reasonably declined to give Dr. Brant's opinion controlling or significant weight on the grounds that it "was not well-supported by objective findings and was in stark contrast to the overall record that the ALJ relied on in finding that Plaintiff could perform a range of light work, including the state agency physicians' opinions."  (Doc. No. 17 at 18.)  However, the Commissioner cannot cure a deficient opinion by

---

written by Dr. Brant.  The author of the opinion identifies himself as Fusco's treating physician for the past seven years, which is generally consistent with Dr. Brant's treatment records.  Moreover, the handwriting on the opinion is virtually identical to Dr. Brant's handwritten treatment notes.  The Court notes, however, that even if the opinion at issue were not authored by Dr. Brant but by an unidentified "non-acceptable source" as stated by the ALJ, the ALJ would nevertheless have been required to, at a bare minimum, acknowledge the existence of the opinion and address it in some fashion.

offering explanations never offered by the ALJ.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin,* 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

Moreover, the Court rejects the Commissioner's argument that the ALJ's failure to address Dr. Brant's 2014 opinion is somehow excused because the RFC is supported by the opinions of non-examining state agency physicians Drs. Congbalay and Villanueva.  Both the regulations and Sixth Circuit authority are clear that an ALJ must address a treating source opinion and provide good reasons for discounting it.  *See* 20 CFR § 404.1527(c)(2); *Gayheart*, 710 F.3d at 377.  The fact that the RFC may be supported by other opinions is irrelevant in this context. [12]

The ALJ's failure to address Dr. Brant's 2014 opinion regarding Fusco's physical functional limitations hinders a meaningful review of the decision.  On this basis alone, the Court finds remand is warranted to afford the ALJ an opportunity to properly evaluate Dr. Brant's

---

[12] Additionally, the Sixth Circuit has rejected the argument that it is sufficient to reject a treating physician's opinion solely on the basis that it conflicts with the medical opinions of nontreating and nonexamining doctors.  *See Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.")

opinion.  However, in the interest of a full and complete review, the Court will briefly address the other arguments raised by Fusco in his Brief on the Merits.

Fusco next argues the ALJ erred in "dismissing the findings and opinions of [his] treating physical therapist Mr. Schiff."  (Doc.  No. 15 at 25.)  The Commissioner disagrees, arguing "the ALJ specifically considered the physical therapist's opinion, noted findings from the physical therapy reports, and gave the physical therapy's opinion little weight as to postural or exertional limitations."  (Doc. No. 17 at 16.)

"A physical therapist is not an acceptable medical source under the Commissioner's regulations."  *Waldrup v. Astrue*, 2010 WL 2490423 at *5 (E.D.Ky. June 18, 2010).  Rather, a physical therapist is an "other source" pursuant to 20 C.F.R. § § 404.1513(d) and 416.913(d), which is not subject to the "good reasons" requirement of the treating physician rule.  *See Sisky v Colvin,* 2016 WL 4418104 at * 8 (N.D. Ohio Aug. 19, 2016); *Pyotsia v. Astrue*, 2013 WL 101932 at * 6 (N.D. Ohio Jan. 8, 2013).  Nonetheless, according to Social Security Ruling ("SSR") No. 06–03p, 2006 WL 2329939 (Aug. 9, 2006), an ALJ must still consider opinions and findings from "other sources:"

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007) (noting the ALJ should have

45

provided some basis as to why he was rejecting the opinion of an "other source"); *Hatfield v. Astrue*, 2008 WL 2437673 (E.D. Tenn. Jun. 13, 2008) (noting that "[t]he Sixth Circuit ... appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to explain to the ALJ's discretion"); *Pyotsia*, 2013 WL 101932 at * 6.  Indeed, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file."  SSR 06-03p, 2006 WL 2329939 at * 3.

As noted previously, Fusco presented for physical therapy sessions with Mr. Schiff in August, September, October, and November 2008, as well as in June 2010.  (Tr.  1163-1164, 1170-1172, 1174-1175, 1187-1188, 1198-1199, 1210-1211, 1216-1217.)  Mr. Schiff consistently noted tenderness, reduced range of right knee motion, and reduced right leg strength.  (*Id*.)  On each occasion, he also observed that Fusco ambulated with a limp (sometimes with a cane and sometimes without), was unable to ascend and descend stairs normally, and was unable to squat or kneel.  (*Id*.)

The ALJ acknowledged Mr. Schiff's physical therapy reports and their "indicia as to a 'limp' and difficulty with stairs, squatting and kneeling."  (Tr. 18.)  However, the ALJ discounted these reports on the grounds that they "touch on the claimant's status as disabled, which is an issue reserved for the Commissioner."  (*Id*.)  Emphasizing Mr. Schiff was not an "acceptable medical source" under the regulations,  the ALJ concluded that "although considered, little to no weight is afforded the opinions supplied by a physical therapist as to postural or exertional

46

ability."  (*Id.*)

The Court finds the ALJ failed to properly consider Mr. Schiff's physical therapy reports.  It is true that an ALJ is not bound by conclusory statements maintaining a claimant is disabled.  *See e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  Here, however, the Court does not agree that Mr. Schiff's findings (i.e., that Fusco walked with a limp and was unable to climb stairs normally, squat or kneel) "touched on [Fusco's] status as disabled" or otherwise constituted opinions on issues reserved to the Commissioner.  It is not unusual for medical sources (whether "acceptable medical sources" or "other sources") to offer opinions regarding an individual's ability to walk, climb stairs, squat and kneel.  Indeed, it is fairly standard for such sources to do exactly that.  The Court is concerned that the ALJ afforded little to no weight to Mr. Schiff's reports solely on this basis.  While the ALJ was not required to articulate "good reasons" for rejecting Mr. Schiff's findings, the Court finds it was improper to discount them for this reason alone.  On remand, the ALJ shall reconsider Mr. Schiff's physical therapy reports and evaluate them in accordance with SSR 06-03p.

Finally, Fusco argues the ALJ improperly assigned little to no weight to Dr. Ahmad's opinion that Fusco was severely restricted in his ability to lift/carry, reach below knee level, push/pull, stand/walk and lift.  (Doc. No. 15 at 26.)  The Commissioner asserts the ALJ "reasonably concluded Dr. Ahmad's extreme opinion that Plaintiff could not perform work activities, except occasional bending, twisting/turning, and sitting, should be rejected because it was inconsistent with the record evidence, including Dr. Ahmad's examination findings."  (Doc.

No. 17 at 18-19.)

The Court finds the ALJ did not improperly evaluate Dr. Ahmad's opinion regarding Fusco's physical functional limitations.  As noted *supra*, Dr. Ahmad completed a "Report of Work Ability" that contained specific limitations relating to Fusco's physical impairments.  (Tr. 847.)  Specifically, this Report stated that Fusco could not lift or carry any amount of weight, reach below the knee, push/pull, squat/kneel, stand/walk, or lift above the shoulders; and could only occasionally bend, twist/turn, and sit.  (*Id*.)  Dr. Ahmad expressly noted, however, that these restrictions were "temporary" and pertained only to the time period December 29, 2010 to March 25, 2011.  (*Id*.)  Thus, it was not improper for the ALJ to assign little to no weight to Dr. Ahmad's opinions regarding Fusco's physical functional limitations.

Accordingly, the Court finds the ALJ failed to properly evaluate (1) Dr. Brant's 2014 opinion regarding Fusco's physical functional limitations, and (2) Mr. Schiff's physical therapy reports and findings.  Moreover, this portion of the decision is so devoid of explanation that it deprives the Court of the ability to conduct a meaningful review of the ALJ's decision.  Thus, the Court recommends that remand is necessary, thereby affording the ALJ an opportunity to sufficiently address the physical functional limitations assessed by Dr. Brant and Mr. Schiff.

**B.**     ***Step Two Finding regarding Fusco's Mental Impairments***

Fusco maintains the ALJ erred in finding his mental impairments were not "severe" at step two of the sequential evaluation process.  (Doc. No. 15 at 19.)  Specifically, he argues the ALJ improperly relied on the opinions of state agency psychiatric consultants Warren, Umana, and Waggoner to support the finding of non-severity, asserting that "one consultant reviewed a prior application file in December 2009 without the benefit of evaluating most of the evidence . .

. and the other two reviewing psychologists found 'insufficient evidence' to fully evaluate Mr. Fusco's condition noting only their review of the May 2010 examination."  (*Id.* at 21.)  In sum, Fusco argues the ALJ's finding on this issue is not supported by substantial evidence because it fails to properly account for all of the record evidence, including evidence of Fusco's treatment history with Dr. Cassady.

The Commissioner argues substantial evidence supports the ALJ's finding that Fusco's mental impairments were "non-severe."  (Doc. No. 17 at 10.)  She asserts the ALJ recognized Fusco was treated for depression and anxiety but properly found his "lack of significant psychiatric treatment" was inconsistent with a severe mental impairment.  (*Id.*)  The Commissioner further maintains the ALJ's non-severity finding is supported by Fusco's self-reported activities, including "spending time with others, occasionally preparing meals and attending church, shopping, caring for a grandchild, dating, driving, and performing household chores."  (*Id.* at 11.)  Finally, the Commissioner notes the ALJ also properly took into account the reports of Drs. Halas, Benson-Blankenship, Smith, and Brant.  (*Id.* at 11-12.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§

49

404.1521(a) & 416.921(a).[13]  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id*.  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not

---

[13] In addition, pursuant to 20 C.F.R. § 404.1520a(a), "when [the Social Security Administration] evaluate[s] the severity of mental impairments for adults ... [it] must follow a special technique at each level in the administrative review process."  Fusco does not specifically argue that the ALJ erred because she failed to follow the "special technique" set forth in this regulation.

50

severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, at step two, the ALJ determined Fusco's medically determinable impairments of depression and anxiety "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore 'non-severe.'" (Tr. 14.)  Examining the four broad functional areas set out in the regulations for evaluating mental disorders, the ALJ found Fusco had (1) no limitation in activities of daily living; (2) mild limitation in social functioning; (3) no limitation in concentration, persistence, and pace; and (4) no episodes of decompensation that have been of extended duration.  (Tr. 14-15.)  Of particular importance to the ALJ in this determination was Fusco's "apparent unrestricted mental ability to operate a motor vehicle."  (Tr. 15.)

Because the ALJ found Fusco had several severe physical impairments (i.e., his right knee and left shoulder impairments), she continued through the sequential evaluation to step

51

three, finding Fusco did not have an impairment or combination of impairments that met or medically equaled one of the Listings.  (Tr. 16.)  The ALJ then proceeded to determine Fusco's RFC at step four.  At no point in the decision (either at step four or otherwise) does the ALJ acknowledge or address Fusco's multiple individual psychotherapy sessions with Dr. Cassady between April and October 2010.

In the decision, the ALJ evaluated the opinion evidence regarding Fusco's mental impairments as follows:

> The undersigned affords the assessment of State agency psychiatric consultant, Vicki Warren, Ph.D., great weight (Exhibit 8F).  Dr. Warren opined that the claimant was without a 'severe' psychiatric impairment during the period in question.  The undersigned finds said assessment consistent with the claimant's reports that he was able to spend time with family and friends, care for a grandchild, and participate in significant activities of daily living (such as driving and the sharing of household chores) (Exhibit 7F).  Finally, **said assessment is consistent with the claimant's lack of significant psychiatric treatment (no more than prescribed medication)** and the lack of significant psychiatric symptomology documented upon State agency psychiatric examination (Exhibit 7F).

(Tr. 19) (emphasis added).  The ALJ then explained that she afforded "partial weight" to the assessments of state agency psychiatrists Drs. Waggoner and Umana that there was insufficient evidence to substantiate a psychiatric impairment, finding "there is evidence of record as to a diagnosed psychiatric impairment."  (*Id.*)

With regard to Dr. Halas, the ALJ afforded "little weight" to his opinions on the grounds they were "inconsistent with or out of proportion to the objective findings of record."  (Tr. 19.) The ALJ further explained:

> Moreover, Dr. Halas' assessments are substantially inconsistent with multiple opinions of record.  For example, Dr. Halas reported that the claimant has moderate impairment as to his ability to relate to others and withstand work stress.  However, Dr. Halas' clinical examination documented the claimant as

52

cooperative, motivated, independent, without impulsivity or compulsion, and able to supply goal directed responses.  (*Id.*)  Additionally, said examination was without objective indicia as to an inability to interact appropriately. Further, Dr. Halas' report uses words such as 'likely' when describing the extent of the claimant's opined limitations. The undersigned finds said terminology vague and conclusory in nature and non-specific as to the claimant's psychiatric capacity.  Finally, unlike the State agency psychiatric consultants, Dr. Halas was unable to review the claimant's treatment record, or lack therefore, when affording said assessment.  Consequently, the undersigned affords greater weight to the assessments of multiple State agency psychiatric consultants, such as Dr. Warren, who opined that the claimant was without a 'severe' psychiatric impairment during the period in question.

(Tr. 19-20.)  The ALJ went on to state that she afforded "little to no weight" to the opinion of Dr. Benson-Blankenship, explaining that opinion was "substantially conclusory in nature" and "without documentation as to an objective mental status examination."  (Tr. 20.)  The ALJ similarly rejected Dr. Smith's opinion as "without objective documentation as to significant psychiatric symptomology that would support a 'severe' psychiatric impairment."  (*Id.*)  Finally, as set forth previously in this Opinion, the ALJ afforded little to no weight to the medical source statement provided by Dr. Brant regarding Fusco's mental impairments.  (Tr. 22.)

The Court recognizes Sixth Circuit authority holding that, when the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz,*  837 F.2d at 244.  Here, however, the ALJ's consideration of Fusco's depression and anxiety (at both step two and step four) appears to have been based on an incomplete review of the record.  As support for her conclusion that Fusco's depression and anxiety were "non-severe," the ALJ heavily relied on the opinion of state agency psychiatrist Dr. Warren.  (Tr. 15, 19, 20.)  Indeed, the ALJ afforded "great weight" to Dr. Warren's opinion and repeatedly stated that her step two finding of non-severity was consistent with Dr. Warren's opinion.  (*Id.*)

53

One of the primary reasons the ALJ afforded Dr. Warren's opinion "great weight" was that the ALJ determined Dr. Warren's "assessment is consistent with the claimant's lack of significant psychiatric treatment (no more than prescribed medication.)" (Tr. 19.)  This statement, however, fails to take into account Fusco's six month course of individual psychotherapy sessions with Dr. Cassady.  As noted previously, the ALJ does not reference Dr. Cassady's treatment notes (either by Dr. Cassady's name or by Exhibit Number 14F/82-87) anywhere in the decision.  It is, thus, unclear to this Court whether the ALJ considered Fusco's treatment with Dr. Cassady in reaching her determination that Fusco's depression and anxiety were "non-severe."  Moreover, even if the Court were to assume that the ALJ did consider Dr. Cassady's treatment notes, the ALJ fails to explain how or why Fusco's treatment history with Dr. Cassady demonstrates a "lack of significant psychiatric treatment."  Lastly it also bears noting that Dr. Warren's opinion (dated December 2009) pre-dates Fusco's treatment with Dr. Cassady.  Thus, Dr. Warren's opinion that Fusco's mental impairments were non-severe is itself based upon an incomplete record.

As this matter is being remanded for the ALJ to consider Dr. Brant's February 2014 opinion regarding Fusco's physical impairments and Mr. Schiff's physical therapy reports, the Court finds the ALJ should also revisit her step two determination that Fusco's mental impairments were non-severe, in light of Dr. Cassady's treatment notes. [14]

## VII.    CONCLUSION

---

[14] The Court is aware of the VE's testimony that Fusco could perform his past work as a gas station cashier even with certain mental limitations.  (Tr. 44.)  However, as the RFC may change depending on the ALJ's assessment of Dr. Brant's and Mr. Schiff's opinions, the Court finds reconsideration of the step two findings regarding Fusco's mental impairments is nonetheless necessary.

For the foregoing reasons, the undersigned finds the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this Opinion.

 s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 15, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**